UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

KENNEDY FUNDING, INC.,

    Plaintiff,

-vs-                                                      Case No. 97-993-Civ-Orl-3ABF(19)

UPLAND DEVELOPMENT, INC., et al.,

    Defendants.

---

# MEMORANDUM OPINION AND ORDER

This matter comes before the Court following a Bench Trial,[1] including pretrial briefing and closing arguments. This Memorandum Opinion constitutes the findings of fact and conclusions of law contemplated by the Federal Rules of Civil Procedure.

## NATURE OF THE ACTION

### The Merchant of Time Shares[2]

Plaintiff, Kennedy Funding ("Kennedy"), a self styled asset based "lender of last resort," filed this action seeking to recover fees alleged to be due under a Loan Commitment (Plaintiff's Trial

---

[1] The parties consented to trial and determination of this case by the Magistrate Judge under 28 U.S.C. § 636(c).

[2] The subject matter of this case, a failed loan, and the parties' respective vehemence in seeking strict enforcement of their claimed rights calls to mind the plot of Shakespeare's *Merchant of Venice*. Of course, that play includes distasteful examples of anti-Semitism, as well as romantic adventures, neither of which bear any relation to this case. Some of the play's other references and observations regarding human nature remain both timeless and relevant to the case at hand.

Ex.10) signed by Defendant, Upland Development[3] ("Upland"). Unable to secure financing from more conventional sources, Upland obtained the Kennedy Loan Commitment to provide funds to acquire land and begin development and marketing of a planned time share project in Central Florida. No loan from Kennedy to Upland ever closed. Upland counterclaimed for return of fees paid and for damages based on alleged breach of the Commitment.

## LITIGATION PROCEEDINGS

This case was originally filed in state court in New Jersey. After removal to federal court on diversity grounds, the case was transferred to this Court on motion of the Defendants.

## FACTS

Upland is a family business formed by co-defendants Jeffrey and Christopher Unnerstall. The Unnerstalls are from Missouri where they had experience in real property site preparation and heavy construction. Like any number of other visitors who spend time in the semitropical sun, the Unnerstalls were intrigued by the peculiar, and potentially lucrative, arithmetic of Florida time share developments. As a result, Upland obtained an option to purchase 635 acres of undeveloped land near Walt Disney World for the purpose of building a time share project. Upland also took various other preparatory steps to carry out this plan, including creation of a business plan and financial projections and undertaking an environmental and regulatory review.

Upland, however, lacked the financial wherewithal even to exercise the purchase option, much less begin development and marketing. Unable to secure conventional financing based on the projected time share values, Upland sought loans from businesses such as Kennedy, knowing that the

---

[3]The principals of Upland, Jeffrey and Christopher Unnerstall are also defendants and counterclaimants.

terms would be less favorable than those associated with typical real property acquisition and development financings.

The high fees and restrictive terms proposed by Kennedy were not joyful news for Upland. Nonetheless, the Unnerstalls were confident that their ship would come in, and after considerable negotiation and numerous changes in the terms, both sides signed the Loan Commitment. Despite the time and energy spent drafting and modifying the Loan Commitment before it was signed, the details of the parties' undertakings are not clearly and accurately described. The general tenor of the deal is expressed, but some crucial aspects are undefined, incorrectly stated, or inconsistent with the parties' actual course of performance.

The gist of the actual deal, as demonstrated by the Loan Commitment as well as the parties' subsequent words and deeds, was that Kennedy would arrange[4] for a loan to Upland of up to $35,000,000 (plus a fee payable to Kennedy equal to 10 per cent[5] of the amount loaned). Upland paid an additional fee of $360,000 and was obligated for $690,000 more at closing. These amounts were independent of the actual amount loaned. The amount to be loaned was determined, ambiguously and vaguely, on the "as is" and "as built" "quick sale" value of the project. None of these terms was well defined by the parties, and the resulting disagreement regarding the amount to be loaned was predictable.

Upland, despite the cost of the high interest rate and fees, was interested in having as much cash available for development and marketing as possible. Kennedy, despite the lure of the high

---

[4] Kennedy's practice was to bring together investors interested in lending for projects rather than putting itself at risk for the entire loan.

[5] The Loan Commitment provides for a flat fee of $3,500,000. The parties agree, however, that this portion of the fee was to be 10 per cent of the actual loan. This characterization is consistent with the negotiations regarding the amount to be loaned.

AO 72A
(Rev.8/82)

interest rate, was interested in the maximum level of security cushion for the loan. As a result, there was conflict on the loan amount. The parties disagreed on the proprty/project valuation to be used to set the loan amount, with Kennedy initially offering $11,000,00 and Upland insisting on $35,000,000.

The parties negotiated as to the loan amount and also retained an appraiser, as contemplated in the Loan Commitment. Still they were unable to agree on the amount to be loaned. Notwithstanding the disagreement and uncertainties about an initial closing and subsequent draws, lawyers were retained and draft closing papers were exchanged. In addition, the parties discussed numerous possible alternatives to or restructuring of the loan. During this time, Upland was also having discussions with the property owner to extend the purchase option and possible seller financing for the purchase and development costs. The Unnerstalls sought and eventually obtained some private financing from friends in Missouri.

Kennedy's last offer was for a loan of $14,000,000. In the end, the Kennedy loan did not close, and Upland restructured its deal with the seller using the private financing.

## CONTENTIONS OF THE PARTIES

### The Pound of Flesh

Kennedy sued to recover unpaid commitment fees ($690,000 plus 10% of $14,000,000), claiming that it was ready to fund the loan in the amount determined under the Commitment. Upland counterclaimed for damages, claiming that Kennedy breached the Commitment by refusing to fund an amount sufficient to allow the project to close and development to begin. Both sides claim that the other acted in bad faith.

AO 72A
(Rev.8/82)

## STANDARDS OF LAW *(A Daniel Come to Judgment)*

Although the pleadings set forth various theories of fraud and unjust enrichment, the case was tried essentially (and properly so) as a breach of contract claim. Under Florida law, the implied covenant of good faith and fair dealing is a part of every contract. *County of Brevard v. Miorelli Eng'g, Inc.*, 703 So. 2d 1049, 1050 (Fla. 1997) ("[E]very contract includes an implied covenant that the parties will perform in good faith.") New Jersey law is in accord. *Sons of Thunder, Inc. v. Borden, Inc.*, 690 A. 2d 575, 587 (N.J. 1997). Moreover, both states recognize the general principle that a Court can look to the course of conduct undertaken by the parties to a contract, to aid the Court in construing any ambiguities. *See Moscowitz v. Middlessex Borough Bldg. & Loan Ass'n*, 82 A 2d. 228 (N.J. Super. L. 1951), *affirmed*, 87 A. 2d 33 (N. J. Super. Ct. App. Div.1952); *Chmil v. Mediterranean Manors Ass'n, Inc.*, 516 So. 2d 1109 (Fla. 2 DCA 1987).

## CONCLUSIONS OF LAW

The Loan Commitment in this case was conceived in naive optimism, born of desperation, reared in mistrust, and died of mutual greed. In moving from the Commitment to a potential closing neither party acted in strict accordance with even the unambiguous terms of the Commitment. Nor did either side act in complete good faith. The Commitment itself is close to void for vagueness. Nonetheless, the parties performed as if they were under some version of the Loan Commitment and worked to come to an agreed initial draw and terms for an actual loan, even if the terms differed from those set forth in the Loan Commitment. The failure to reach a closing was due in large part to the efforts of each side to extract better terms as disagreements developed and ambiguities came to light. After months of negotiations, Upland declined to close a loan in the amount and on the terms demanded by Kennedy.

AO 72A
(Rev.8/82)

## *The Quality of Mercy*

The parties each argue that the other side was less than candid, did not operate in good faith and purposely sought to take advantage of the situation.[6] While this is undoubtedly so, responsibility for the unhappy situation stems directly from the vague and ambiguous terms of the contract drafted by *both* sides. Since the parties are jointly responsible for creating this dispute, the Court looks to their contract to resolve it.

As set forth in the Loan Commitment, at "OTHER, paragraph C. 2)" (Pl. Trial Ex. 10, p.5):

> Notwithstanding the above, if KFI's [Kennedy Funding] determination of the quick sale value does not support a $35 Million loan, the Borrower has the following options: . . . 2) Terminate the commitment within Forty Eight (48) hours of receipt of KFI's loan offer and KFI will refund Fifty Percent (50%) of the paid portion of the commitment fee less all actual expenses.

Applying this agreed provision most closely fits what actually occurred. The Loan Commitment contemplated the possibility that the loan might not close, particularly if Kennedy proved unwilling to lend the maximum amount. Because it never evaluated the project on an "as built" basis to make a corresponding offer, Kennedy cannot claim entitlement to all the commitment fees. Upland cannot claim damages for breach of the "as built" valuation requirement because it also failed to offer any real valuation based on market value of the project at any particular stage of construction.[7] In addition, both parties waived strict compliance with the provisions of the Commitment by their continuing negotiations, extensions and modifications. Neither side in this case is entitled to its claimed "pound of flesh" or corresponding forfeiture.

---

[6] "Thou art come to answer/ A stony adversary, an inhuman wretch,/ Uncapable of pity, void and empty/ From any dram of mercy." *The Merchant of Venice,* Act 4, Scene 1.

[7] Upland's reliance on a pre-development feasability study is misplaced. That study nowhere gives a market value, much less one based on quick sale. Instead, the study offers a discounted cash flow analysis based on the artificial economics of selling time share units. This blue sky value has no relation to the hard asset valuation contemplated by the Loan Commitment.

AO 72A
(Rev.8/82)

Under paragraph C. 2), Upland is entitled to refund of half the paid commitment fee, less actual expenses incurred by Kennedy. The fees paid were $360,000. Kennedy proved expenses of $28,353.12.[8] The Clerk is directed to enter judgment in favor of Upland Development, Inc. against Kennedy Funding, Inc. for $331,648.88 plus prejudgment interest[9] of $99,494.66, for a total of $431,143.54. All other claims and counterclaims are dismissed with prejudice. Because no party substantially prevailed on its or his principal contentions, no costs are allowed.

**DONE** and **ORDERED** in Orlando, Florida this 30th day of November, 1999.

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record

---

[8] The fees paid to potential lending participants were not shown to be actual expenses rather than fee sharing. Also, Kennedy did not adequately prove that all of the legal fees claimed were associated with carrying out the proposed deal. The Court allows $15,000 as an expense for legal fees.

[9] Interest is calculated at the Florida statutory rate (as determined by the State Comptroller) of 10 per cent per annum from a reasonable period following Upland's final notice that the loan amount was unsatisfactory.

AO 72A
(Rev.8/82)